**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA**

**v.**

**CRIMINAL ACTION NO.:** 3:24CR18
**VIOLATION:** **18 U.S.C. § 1343**
**18 U.S.C. § 1349**

**FRAME INC.**

**Defendant.**

**INFORMATION**

The United States Attorney charges that:

**GENERAL ALLEGATIONS**

At all times relevant to this Information:

1. The United States Postal Service ("the Postal Service" or "USPS") is an independent agency of the executive branch of the United States government that is responsible for providing postal service in the United States.

2. EMCOR Facilities Service, Inc. ("EMCOR"), conducts business under the name of the EMCOR Customer Solutions Center ("EMCOR-CSC"), and is a corporation that maintains its principal places of business in Phoenix, Arizona, and Norristown, Pennsylvania. EMCOR is in the business of acting as an agent or clearing house responsible for receiving service calls for needed repair work or alterations on its customers' facilities and then assigning those to service providers ("SPs"); reviewing and approving proposals submitted by the SPs for performing the requested work; monitoring the SP's performance of the work; and then receiving the final invoice from the SP and processing it for payment. EMCOR's customers include both government agencies and private companies and entities. Starting in

or about 2006, EMCOR entered a contractual relationship with the Postal Service whereby it agreed to act as its agent for the performance of the functions listed above.

3. The EMCOR-CSC was responsible for assigning work orders for repairs to its clients' facilities; monitoring the timely performance of the repairs; and approving proposals and paying invoices received from companies it hired to perform repair work. The EMCOR-CSC's main offices were located in Phoenix, Arizona, while the conduct of repair work and alterations on Postal Service facilities located in the state of West Virginia was primarily overseen by USPS personnel in offices located in Greensboro, North Carolina and Warrendale, Pennsylvania.

4. **FRAME INC.** was a construction service company properly incorporated in the state of West Virginia that conducted its business from offices located at 212 Leon Sullivan Way, in Charleston, WV 25314 until on or about January 2021. From on or about January 2021, **FRAME INC.** conducted the business remotely from various locations in the state of Florida, while remaining an incorporated entity in the state of West Virginia. **FRAME INC.** began doing business with the Postal Service prior to 2010. Since at least 2016, **FRAME INC.** became a SP to the Postal Service by entering into a series of contractual agreements with the EMCOR-CSC whereby it agreed to provide repair services to USPS facilities located within a 150-mile range of Charleston, WV.

5. James M. Frame, Sr. is the owner of **FRAME INC.**, and he oversaw its performance on individual EMCOR work orders issued on behalf of the Postal Service. James M. Frame, Sr. managed the selection of subcontractors and the negotiation of prices with them as to materials and labor costs, and the submission of job estimates and final invoices to EMCOR. James M. Frame, Sr. developed and submitted all of **FRAME INC.** quotes or proposals for work orders transmitted to EMCOR and the Postal Service.

6. Commencing as early as 2016, **FRAME INC.** entered a series of contracts known as "supplier agreements" with EMCOR-CSC whereby EMCOR-CSC agreed to perform repair work on Postal Service facilities subject to certain terms, conditions, and requirements. Among other things, these contracts specified:

- the labor rates that would be paid by EMCOR and the Postal Service for particular labor classifications (such as General Foreman, Foreman, Tradesman, and Apprentice or Laborers) or trade/service classifications (such as HVAC, Electrical, Overhead Doors, Lighting, Lock & Key, Plumbing and Signs and Flags);

- the maximum allowable mark-ups for materials and equipment rental, which for the applicable agreement was 20%;

- the allowable amounts that would be paid for trip charges to analyze the repair or maintenance issue identified in the work order, and to perform the necessary repairs;

- the time period within which Frame Inc. had to respond and complete needed repairs, based upon the priority level assigned by EMCOR (from Level P5 [highest and most urgent] to Level P1 [lowest and least urgent]).

7. The contractual relationship between **FRAME INC.** and the EMCOR-CSC continued until December 2022. During their contractual relationship, **FRAME INC.** and the EMCOR-CSC periodically executed new contracts governing the terms and conditions of their relationship. The last contract agreement between **FRAME INC.** and EMCOR-CSC was signed in February 2021.

8. The contract included several provisions relating to the use of subcontractors by a SP such as **FRAME INC.** on repair projects assigned to it by the EMCOR-CSC. For example, all agreements included the following statement in bold-type face on the first full page of the agreement that was specifically made applicable to work performed on Postal Service facilities:

**If the work is subcontracted (USPS only) by Supplier, Supplier's invoice must include the subcontractor's invoice that shows labor rates, labor hours, total workers on location, itemized materials, and a full description of the work. If this is not provided, the invoice will be rejected until such information is delivered. A subcontractor's quote cannot be used as an invoice. Support must be an actual invoice provided by subcontractor.**

**USPS ONLY allows for specific Material markups and markups on subcontractor invoices as well as specific allowable Trip Charges found in the USPS Addendum to Performance Standards Attachment (Exhibit A).**

This information was then repeated on page six of the contract with the further warning that "Invoices deviating from these requirements will NOT be processed for payment until the problem has been resolved to the Customer Solutions Center's satisfaction."

9. The contract agreement required all SP invoices to be "supported with a properly completed and signed Service Provider Verification of Provider who performed services. The sign off sheet must be completed to identify the Name of the Company completing the work order request, signature of company representative, and identification is [sic] the work order was completed as Self perform, Subcontracted, or a combination of both."

10. James M. Frame, Sr. was authorized to sign contracts on behalf of **FRAME INC.**, and his initials appear at the bottom of every other page of the contract agreement.

11. The contract agreement outlines the documentary requirement of SP invoices and requires subcontractor's invoice, if applicable, on each type and tier of work order type, both Not to Exceed and Firm Fixed Cost.

12. The "Compensation and Rate Structure" section of the agreement states in bold-type face that "Markups for subcontracted efforts invoicing shall be as follows: $0.00 to $500.00 no more than $50 markup; $501.00 to $15,000.00 no more than 10% markup; $15,001.00 to $25,000 no more than 8% markup."

13. The agreement also provided that **FRAME INC.** must submit all of its invoices electronically through the Invoice Management Portal (IMP). Invoices entered into the IMP were reviewed by EMCOR personnel in Phoenix, Arizona and Norristown, Pennsylvania.

14. In addition to the initials of James M. Frame, Sr.'s at the bottom of every page, the contract agreement also bears of signature of James M. Frame, Sr. directly beneath the following certifications: "**Supplier hereby agrees to and accepts the foregoing terms and conditions. Supplier certifies and warrants that the responses provided to the Qualification Questionnaire are true and correct and that Supplier is in compliance with this Agreement**."

15. Throughout the period from approximately 2016 through December 2022, **FRAME INC.** transmitted proposals prepared in response to work orders to EMCOR Offices in Phoenix, Arizona, and on jobs over $5000 to Postal Service Offices in North Carolina and Pennsylvania. Likewise, since about 2016, the final invoices for those assignments were sent to EMCOR-CSC, by electronic means via email and electronic server from its offices in the states of West Virginia and Florida to EMCOR-CSC's offices in Phoenix, Arizona and Norristown, Pennsylvania respectively.

**COUNT ONE**

(Conspiracy to Commit Wire Fraud)

1. Paragraphs 1 through 15 of the General Allegations section of this Information are re-alleged and incorporated fully by reference herein.

2. From at least on or about January 2018, and continuing thereafter until on or about December 5, 2022, in the Northern District of West Virginia and elsewhere, **FRAME INC.** and others knowingly and intentionally conspired and agreed to devise a conspiracy or artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, through the transmission of wire communications in interstate commerce, in violation of Title 18, United States Code, Section 1343.

**The Objects of the Conspiracy**

3. The object of the conspiracy and scheme to defraud was for defendant **FRAME INC.,** and others, to unlawfully obtain excess payment for services by submitting fraudulent bills and concealing the use of subcontractors.

a. to enable **FRAME INC.** to substantially increase its revenues from repair projects on facilities located within the Northern District of West Virginia, assigned to it by the EMCOR-CSC by hiding from EMCOR personnel that it was using the services of subcontractors on many of these projects, thereby enabling **FRAME INC.** to submit bills for its supposed services at rates in excess of the amount the subcontractor or subcontractors were charging it, and also far in excess of the specified mark-up that would otherwise have been allowed under the contract agreement between **FRAME INC.** and EMCOR-CSC; and

b. to cover up and hide from EMCOR personnel the fact that **FRAME INC.** was frequently using the services of subcontractors to perpetuate the continuation of the scheme by means of false representations, omissions, and other forms of deceptive and misleading conduct.

**The Manner and Means of the Conspiracy and the Scheme to Defraud**

4. The manner and means by which the Defendant, **FRAME INC.,** and its co-conspirators sought to accomplish the purposes of the conspiracy and the scheme to defraud included, among other things, the following:

a. It was a part of the conspiracy and the scheme to defraud that **FRAME INC.** fraudulently misrepresented or caused to be misrepresented its use of subcontractors on the repair projects performed within the Northern District if West Virginia, assigned to it by EMCOR by not disclosing its use of subcontractors on the proposals and invoices that it submitted to EMCOR, and by not providing the estimates or invoices that **FRAME INC.** had received from the subcontractors it hired to perform the repair services, including at facilities located in Berkeley, Jefferson, Morgan, Hampshire, and Mineral Counties, within the Northern District of West Virginia and elsewhere, assigned to it as required when it submitted proposals and invoices to EMCOR.

b. It was further a part of the conspiracy and scheme to defraud that **FRAME INC.** executed and modified completion certificates, a required part of the final invoice process, to indicate that **FRAME INC.** had self-performed the work in question.

c. It was further a part of the conspiracy and scheme to defraud that **FRAME INC.** falsely added trip fees and labor hours for its "labor" to proposals and invoices in connection with repair projects assigned to **FRAME INC.** on projects where no employees traveled to the postal facility in connection with the initial assessment or completion of the assigned repair work.

d. Throughout the period from approximately January 2018 through December 2022, **FRAME INC.** transmitted the proposals prepared by James M. Frame, Sr. in response to 222 West Virginia work orders performed within Berkeley, Jefferson, Morgan, Hampshire, and Mineral Counties,

in Northern District of West Virginia and elsewhere, to EMCOR Offices in Phoenix, Arizona, and on jobs over $5,000 to Postal Service Offices in North Carolina and Pennsylvania.

    e. Likewise, since about 2018, the final invoices for those assignments were sent to EMCOR-CSC, by electronic means via email and electronic server from its offices in the states of West Virginia and Florida to EMCOR-CSC's offices in Phoenix, Arizona and Norristown, Pennsylvania respectively, on 222 work orders performed within the Berkeley, Jefferson, Morgan, Hampshire, and Mineral Counties, in the Northern District of West Virginia and elsewhere, all in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION

1.    Pursuant to FED. R. CRIM. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853, and 28 U.S.C. § 2461(c), in the event of the defendant's conviction on this Information.

### Wire Fraud Forfeiture

2.    Upon conviction of the offenses set forth in Count One, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the defendant, **FRAME INC.**, shall forfeit to the United States any and all assets and property, real or personal, that constitutes or is derived from proceeds traceable to such offenses, including but not limited to a money judgment in the amount of the proceeds the defendant obtained from his wire fraud scheme, specifically, $187,286.00 in United States currency.

### Substitute Assets

3.    If, as a result of any act or omission of the defendant, any of the property described above as being subject to forfeiture:

    a.    cannot be located upon the exercise of due diligence;
    b.    has been transferred or sold to, or deposited with, a third person;
    c.    has been placed beyond the jurisdiction of the Court;
    d.    has been substantially diminished in value; or,
    e.    has been commingled with other property which cannot be subdivided without difficulty,


the United States, pursuant to 21 U.S.C. § 853(p), shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above.

Kimberley D. Crockett (for)
William Ihlenfeld
United States Attorney

Kimberley Crockett
Assistant United States Attorney

Morgan McKee
Assistant United States Attorney